UNIVERSAL MAJOR ELECTRICAL APPLIANCES, Inc., a body corporate, Appellant,

v.

GLENWOOD RANGE COMPANY, a body corporate, Appellee.

No. 6940.

United States Court of Appeals Fourth Circuit.

Argued April 20, 1955.

Decided May 24, 1955.

John P. Hampton, Chicago, Ill. (Philander B. Briscoe, Baltimore, Md., and Louis Linton Dent, Chicago, Ill., on brief), for appellant.

William A. Fisher, Jr., Riderwood, Md., and Francis S. Moulton, Jr., Boston, Mass. (Neil Leonard, Boston, Mass., and William D. Macmillan, Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by Glenwood Range Company of Taunton, Massachusetts, against Universal Major Electrical Appliances, Inc. of Baltimore, Maryland, to recover damages for breach of a contract of sale of refrigerators between Glenwood and Artkraft Manufacturing Corporation of Lima, which subsequently merged into Universal. Breach of the contract by Artkraft was denied and a counterclaim was filed for breach of the contract by Glenwood by failing to accept all of the goods covered by the agreement. The questions at issue spring in large part from the fact that the contract consisted in part of written, and in part of parole terms, and differences as to the terms included and the interpretation to be given them have arisen.

The writing consisted of a letter of January 19, 1951 from Artkraft which is a manufacturer of refrigerators, to Glenwood which is a manufacturer of stoves and was then about to add to its business a line of refrigerators to be purchased from other manufacturers. The letter was signed by Artkraft and brought by one of its officers to Taunton and there accepted and signed by Glenwood, so that the contract is controlled by the law of Massachusetts in which State the Uniform Sales Act is in force. The material terms of the contract, so

far as they appear in the letter, were as follows:

"This will constitute an order for 2400 refrigerators to be delivered at approximately 1/12 per month for twelve (12) months, and unless cancelled thirty (30) days before expiration of any one year period, shall continue on from year to year on a like basis.

"You are to give us an approximate assortment of your schedule ninety (90) days ahead of time; a closer estimate sixty (60) days ahead of time and a firm model release thirty (30) days ahead of production, at all times. The quantities specified herein can be increased 25% by giving us enough notice to procure material, at no extra cost, and to the extent that our labor and material will allow, can be increased more than that by mutual agreement.

"Your are to advance to us $5.00 per refrigerator for the total amount covered under this contract, and we will amortize back to you at the rate of $4.00 per refrigerator, so that you will have all your money back in fifteen months, or less.

"Terms are Net Cash, 10th and 25th prox.

"The method of costing this refrigerator to you will be as follows:

\* \* \* \* \* \*

"Each refrigerator will bear a standard warranty by our factory for one year against defects in material or workmanship. If you desire to reinsure you five year warranty, you can do so through Marsh and McLennan, brokers in Chicago, who have submitted a proposal based on insurance in the St. Paul Mercury Company, or the Zurich Company of Switzerland, I believe you have one of their proposal books."

It will be observed that the letter constituted only a partial integration of the contract, since it did not disclose the kind of refrigerators sold, and showed of itself that something was needed to complete the agreement. See Restatement of Contracts, § 229.

The uncontradicted evidence, however, shows that the missing description was supplied by oral statements and references to advertising matter during previous negotiations between the parties and immediately after the signing of the letter at the Glenwood place of business in Taunton. Theretofore at Lima and at Chicago representatives of Glenwood were shown two refrigerators of the type manufactured by Artkraft as well as Artkraft's advertisements of its product; and at Taunton the parties conferred and agreed upon the draft of a page to be inserted in Glenwood's catalogue which contained a description of its new line of refrigerators in the following words:

"Model GMD–10–70—Equipped with freezer 70 pounds frozen food storage. Two large porcelain crisper pans \* \* \* 14¾ qt. each moist storage capacity. \* \* \* Exclusive three plate horizontal leakproof evaporator. Mammoth meat keeper and chill tray. \* \* \*

"Model GHD–9–52—Equipped with freezer 52 pounds frozen food capacity. One porcelain crisper pan. Mammoth meat keeper and chill tray. \* \* \*"

Upon this evidence the District Judge gave to the jury which tried the case the following instruction as to the terms of the contract:

"The court instructs the jury that under the contract Artkraft was obligated to furnish to Glenwood and Glenwood was obligated to accept refrigerators of similar quality to those shown to plaintiff's representatives at Lima and at Chicago (with the changes in accessories agreed upon by the parties), and which would freeze food and keep it frozen in general accordance with the standard of performance of other refrigerators with freezer compartments on the market in the fall of 1950 and

in January 1951. The 10–70 models were to have a frozen food storage capacity of approximately 70 pounds and the 9.52 models were to have a frozen food storage capacity of 52 pounds.

"It was not necessary that this 70 pound frozen food storage capacity be in the enclosed upper compartment; it could be either in that box or in the chill tray or both. \* \* \*"

The specific issue was also submitted to the jury as to whether the refrigerators furnished under the contract would freeze food and keep in frozen storage 70 pounds of food in the case of Model 10–70, and 52 pounds in the case of Model 9–52, in general accordance with the standard of performance of other refrigerators with freezer compartments on the market at the time the contract was made. There was abundant evidence that the two models did not have the freezing capacities attributed to them, and the jury answered this question in the negative. Accordingly the court ruled that Glenwood was not compelled to accept and pay for refrigerators which had not been delivered, and thereby recovery under the counterclaim was precluded.

We discuss first the contention of the appellant that the court erred in ruling that Artkraft was obligated by the terms of the contract to furnish refrigerators with freezing storage capacities of 70 pounds and 52 pounds respectively. It is conceded that when a writing, which purports to be a contract, is ambiguous or is incomplete, parol evidence may be received on subjects not covered by the written matter,[1] and hence it was proper for the court in the present case to receive evidence of the kind of refrigerator which the contracting parties had in mind insofar as this evidence identified the models GMD 10–70 and GHD 9–52 which were shown to the purchaser or described in the literature. It is, however, contended that the description of the freezing capacities of the refrigerators contained in the parol testimony was admissible only for purposes of identification in order to show that the seller furnished goods identical with the models shown to the buyer, but could not be used to create an express warranty as to the performance of the merchandise.

The appellant bases the argument on the general rule, which is approved in Massachusetts, that a parol warranty may not be attached to a written contract for the sale of goods, which contains an express warranty. The reason given is that the written contract expressly incorporates a particular warranty and hence it is plain that the parties had the subject of warranties in mind and by specifying one excluded any others. Glackin v. Bennett, 226 Mass. 316, 115 N.E. 490; Whitty Manuf. Co. v. Clark, 278 Mass. 370, 180 N.E. 315; Williston on Sales, § 215. Since the letter of November 5, 1951, which constitutes the written part of the contract in suit, contains an express warranty for one year against defects in material and workmanship, it is argued that no other warranty can be added. The argument, however, overlooks the fact that the letter clearly did not contain the complete contract, and something was needed to give it validity. In other words, the contract was only partially integrated. In the cases cited above, where the parol warranty was excluded, the contracts were complete on their face and there was sound basis for the application of the rule; but in the case at bar the new matter, which included the warranty as to the freezing capacity of the refrigerators, was needed to complete the contract and the rule has no application. This qualification of the doctrine is stated in Williston on Sales, § 215, p. 556, as follows:

"Especially in recent years some qualification of this doctrine is to be

---

1. Keller v. Webb, 125 Mass. 88; Stoops v. Smith, 100 Mass. 63; Putnam-Hooker Co. v. Hewins, 204 Mass. 426, 90 N.E. 983; W. R. Grace & Co. v. National Wholesale Grocery Co., 251 Mass. 251, 146 N.E. 908. Restatement of Contracts § 238.

observed in the cases. The principles applicable to contracts only partially reduced to writing find frequent application, and where the writing on its face does not appear to be a complete statement of the contract or the purchase, or is a mere memorandum or order as distinguished from a written contract, or is a promissory note which states that the note is given as the price of a chattel conditionally sold, the reason for applying the parol evidence rule is lacking and extrinsic evidence of an express warranty is admitted."

See also Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N.E. 682, 15 L.R.A.,N.S., 855.

■ This conclusion is also in accord with the provisions of the Uniform Sales Act which is in force in Massachusetts, whether the language descriptive of the goods sold be considered a part of the agreement, as we think that it should be, or a statement of fact extraneous to the agreement which induced the buyer to purchase the goods. Section 12 of the statute, Mass.G.L. c. 106, § 14, defines an express warranty as any affirmation of fact or any promise by the seller relating to the goods if the natural tendency thereof is to induce the buyer to purchase the goods and if the buyer purchases the goods relying thereon. The uncontradicted evidence in the case is that the seller did make positive statements as to the performance of the refrigerators and that the buyer accepted the goods in reliance thereon. The refrigerators manufactured by Artkraft were advertised and described as having a larger frozen food storage capacity than refrigerators of similar size put out by other manufacturers, and these circumstances were emphasized in the negotiations of the parties, and, as we have seen, were included in the advertisement prepared by the parties for the use of Glenwood. It follows that the court was justified in instructing the jury that their verdict should be for Glenwood if they found that the refrigerators did not have the capacity which had been represented. See O'Connell v. Kennedy, 328 Mass. 90, 101 N.E. 2d 892; Williston, Sales § 194.

The decision of the court is also supported by the provisions of §§ 14 and 15 [2] of the Sales Act. Section 14 provides that where there is a sale of goods by description, there is an implied warranty that the goods shall correspond with the description. Section 15(2) and (6) are as follows:

"(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be of merchantable quality.

\*   \*   \*   \*   \*   \*

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith." G.L. (Ter.Ed.) c. 106, § 17.

Such a warranty in a sale by description, although customarily called an implied warranty, is in fact an express warranty when it involves a description of the qualities of the goods which the seller agrees to furnish. Williston on Sales § 223. Such was the conclusion of the court in Fairbanks, Morse & Co., v. Consolidated Fisheries Co., 3 Cir., 190 F.2d 817 in which the court overruled the contention that the terms of a contract of sale descriptive of the goods sold did not constitute an express warranty but were used only for identification. The court said, at page 821:

"\* \* \* There is strong authority, however, for the proposition that any warranty derived from express language should be considered an express warranty. Since such warranty is based on words which are actually a part of the contract between the parties, it seems most unrealistic to call the obligation implied. The detailed Specification expressly in-

corporated into this sales contract cannot be termed merely words of general description used for identification only. The Specification states in minutest detail and in technical terms exactly what the seller promised to deliver. It represents positive affirmation of facts, the natural tendency of which is to induce the buyer to purchase. And a jury could assuredly infer that the defendant relied on this detailed Specification."

The appellant seeks to avoid the effect of these statutory provisions by reference to certain Massachusetts decisions which hold that an implied warranty does not guarantee that the goods shall possess special qualities but only that they will meet certain normal standards established by similar goods on the market. Interstate Grocer Co. v. Geo. W. Bentley Co., 214 Mass. 227, 101 N.E. 147; Agoos Kid Co. v. Blumenthal Import Corp., 282 Mass. 1, 184 N.E. 279; Sokoloski v. Splann, 311 Mass. 203, 40 N.E.2d 874. These decisions, however, do not support the appellant's position. The warranty on which the buyer relies in the case at bar did not call for special qualities over and beyond the normal standard set by similar goods but only that the Artkraft models would freeze the designated quantities of food to the same extent as food is usually frozen by refrigerators on the market. The evidence showed, as we have pointed out, that the freezing capacity of the Artkraft product was held out as a distinctive feature commonly possessed by the goods which Artkraft was offering generally on the market. This outstanding feature was undoubtedly intended by the parties to constitute an element of the contract and the buyer was given to understand that the refrigerators to be delivered would do the work described. To use the words of the statute, the merchantable quality which the goods of the seller were represented to possess was the capacity to freeze certain quantities of food in the two models covered by the contract. See W. R. Grace & Co. v. National Wholesale Grocery Co.,

251 Mass. 251, 146 N.E. 908; Williston on Sales, §§ 205, 223–225. The instructions of the court as to the meaning of the contract were fully justified.

Glenwood's complaint was twofold. It claimed damages as to goods which it had accepted and paid for, because of the failure of the goods to conform with the contract, and also the return of certain monies which it had advanced on account of goods which it subsequently refused to accept. Delivery of refrigerators began in February, 1951 and before the end of July of that year 1025 refrigerators had been delivered. Glenwood paid the contract price for these goods and the additional sum of $7904 which was applicable to goods to be thereafter delivered. At Artkraft's request, Glenwood also advanced the sum of $40,000 on December 15, 1951, with the understanding that it was to be applied to the payment of goods to be thereafter delivered, but upon the promise of Artkraft that if Glenwood was unable to dispose of the goods it would not be required to take them and the money would be returned.

Subsequently on January 25, 1952 Glenwood, being dissatisfied with the goods, wrote to Artkraft that it had become convinced from complaints of customers that the delivered goods were fundamentally defective and that it would not accept any more shipments; and it demanded compensation for the losses it had sustained and reimbursement for the monies it had advanced. Thereafter the complaint in the present suit was filed in which Glenwood asserted that it had been induced by false representations to enter into the contract and demanded damages in the sum of $200,000.

At the conclusion of the plaintiff's evidence the judge ruled that there was no evidence legally sufficient to sustain a cause of action against Artkraft based on fraud, and at the conclusion of all the evidence the judge ruled that Glenwood was precluded from recovering any loss caused by deficiencies in the 1025 refrigerators which had been delivered because

Glenwood had accepted and disposed of the goods and had not notified Artkraft of the breach of contract, as required by § 49 of the Uniform Sales Act, within a reasonable time after Glenwood knew or should have known of the defects. No appeal was taken from these rulings so that the only question remaining for consideration is whether Glenwood is entitled to recover for the monies advanced.

There was evidence pro and con as to whether the parties had entered into the collateral agreement in which Artkraft agreed to cancel the contract as to the undelivered refrigerators in case Glenwood could not use or sell them. The specific issue was submitted to the jury which found, in answer to a question framed by the court, that the agreement was in fact made, and there was ample evidence that Glenwood was unable to sell the remaining refrigerators. The District Judge therefore instructed the jury in the alternative that if they should find either that the refrigerators delivered did not come up to the description in the contract, or that the promise to cancel the contract upon certain conditions as above described was made, their verdict should be for Glenwood in the sum of $47,904; and the jury so found. There was no dispute as to Glenwood's inability to sell the refrigerators and no instruction on this point was requested.

The contention of the appellant is that since Glenwood had not notified Artkraft of the defects in the delivered refrigerators within a reasonable time, as required by the statute, Glenwood lost not only the right to collect damages with respect to the goods which it had accepted but also the right to refuse delivery of the balance of the order. Our attention is called to the provisions of § 69(1)(d) and (3) of the Uniform Sales Act that where there is a breach of warranty by the seller, the buyer cannot recover if he fails to notify the seller within a reasonable time of his election to rescind; and the decisions of the Supreme Court of Massachusetts are cited in John Service Inc., v. Goodnow-Pearson Co., 242 Mass. 594, 136 N.E. 623, 29 A.L.R. 1513;

and Learned v. Hamburger, 245 Mass. 461, 139 N.E. 641.

We do not think that this position is tenable under the circumstances of this case. Glenwood is not asking to rescind the contract but to refuse additional deliveries and to recover monies paid in advance. The rule supported by the weight of authority is that the acceptance of the buyer of one or more shipments of defective goods does not in the absence of circumstances raising an estoppel amount to such a waiver of the defect as to preclude the buyer from rejecting subsequent shipments similarly defective. See 32 A.L.R.2d 1117, 1118. Williston on Sales, 2d Ed., 467(d). Artkraft relies on the Massachusetts decisions last cited, but in these cases it was shown that the goods to be subsequently shipped would have conformed to the contract, while in the pending case it is clear that any refrigerators subsequently shipped would have been as defective as those which Glenwood accepted. The facts in the pending case are more closely analogous to those in Agoos Kid Co. v. Blumenthal Import Corp., 282 Mass. 1, 184 N.E. 279, where the refusal of the buyer to accept subsequent shipments are upheld on the ground that he was justified in assuming that they would contain defective material; and the statement of the rule in Williston, § 467(d) was approved. See also Shotwell Johnson Co. v. C. O. D. Tractor, 154 Minn. 517, 191 N.W. 813. No estoppel was proved in the pending case. There was some reference in the testimony to the purchase and setting aside by Artkraft of material and production facilities for the manufacture of refrigerators ordered by Glenwood; but there was no showing that Artkraft suffered any loss in consequence and there was no request for the submission of the issue of estopped to the jury.

The affirmance of the judgment in Glenwood's favor is also supported by the specific finding of the jury that the agreement as to the repayment of the money advanced by Glenwood was actually made. The payment of this money before it was due upon the promise of

Artkraft that the obligation of Glenwood to accept additional deliveries would be cancelled if Glenwood found that it could not sell the goods, constituted a valid variation of the original contract. The consideration for the promise was the payment in advance of $40,000 before it was due under the terms of the original agreement.

Affirmed.